COLLEEN FLYNN, CSB 234281
ATTORNEY AT LAW
3435 Wilshire Blvd., Suite 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
E-mail: cflynnlaw@yahoo.com

PEDRAM ESFANDIARY, CSB 312569
MONIQUE ALARCON, CSB 311560
BAUM HEDLUND, ARISTEL, & GOLDMAN, P.C.
10940 Wilshire Blvd., 17th Floor
Los Angeles, CA 90024
(310) 207-3233 / (310) 820-7444 facsimile
Email: pesfandiary@baumhedlundlaw.com
Email: malarcon@baumhedlundlaw.com

DONALD W. COOK, CSB 116666
ATTORNEY AT LAW
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA 90010
(213) 252-9444 / (213) 252-0091 facsimile
Email: manncooklaw@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINA ASTORGA, an individual, on behalf of herself and as class representative; HUGO PADILLA, an individual, on behalf of himself and class representative; RYAN MICHAEL DODSON, an individual, and KIYOKO DODSON, an individual, on behalf of themselves and as class representatives,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:20-cv-9805 AB (AGRx)<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF PURSUANT TO THE COURT'S 3/30/23 ORDER (ECF 325)**<br><br>Trial Date: 8/1/2023<br>Time: 8:30 a.m.<br>Ctrm: 7B |

00155526.WPD

## I. EXCESSIVE FORCE INCIDENTS

From *Berg v. County of Los Angeles*, No. 2:20-cv-7870 DMG:

● Declaration of Diana Barbadill, ECF 13-4, Exhibit 2, pp. 9-15 (August 25, 2020 protest): ¶¶13-14 (LASD deputies shot pepper balls and flash bang grenades at her while she was legal observing, when the grenade went off she was hit in the leg); ¶15 (Jill O'Neill was also hit by a flash bang grenade); ¶16 (demonstrator named Joe was hit in the eye by a projectile);

● Declaration of Lisamarie Betancourt ECF 13-4, Exhibit 3, pp. 17-18 (September 8, 2020 protest): ¶8 At 8:25PM, two deputies charged toward the leader with the bullhorn and struck them down. As soon as the leader was arrested, the rest of the deputies charged toward the group while shooting rubber bullets and stingers.... The deputies continued to run, fire, and chase down the protesters for another two blocks.);

● Declaration of David Cunningham, ECF 13-4, Exhibit 5, pp. 56-60: ¶5 (At August 31, 2020 protest as a legal observer; saw a young woman attacked by a Sheriff deputy; went over to document the deputy's use of force. As he was writing notes about the incident, Deputy Hernandez grabbed him by the back of his neck and took him backwards to the ground; ¶¶7-8 (At September 5, 2020 protest. While speaking with a pastor, deputies began firing rubber bullets, tear gas, and pepper balls at them. He was shot on his left side, on his chest and the side of his rib cage, which caused him to fall to the ground.);

● Declaration of Katherine Franco ECF 13-4, pp. 63-68 (September 5, 2020 protest): ¶20 (Around 8:38 p.m., with no provocation and no warning, deputies started shooting. The explosions began suddenly and were numerous and fast, and did not let up for minutes on end. It was frightening and seemed totally unprovoked and unjustified.);

● Declaration of David Patrick McDonald, ECF 13-4 page 76-78 (September 5, 2020 protest): ¶9 (Shot with less lethal munitions in the neck and ribs. With others, was forced to cross Imperial Highway which was still busy with cars to flee from the gas and bullets.);

- Declaration of Alex McElvain, ECF 13-4, pp. 80-84 (September 5, 2020 protest): ¶2 (News Coordinator for news outlet Knock LA); ¶6 (Around 10:05 pm, Sheriff deputies threw tear gas in her direction and not towards the protesters. Followed up with flash bang grenades that exploded directly above her head, which exploded with such impact as to set off a nearby car alarm. She sought cover behind the sheriff station sign on the side facing the street. The sheriff deputies provided no warning or dispersal order prior to using force.); ¶7 (The deputies then began shooting less lethal munitions at the protesters. She attempted to leave by walking directly away from the station, towards the street to safety, when she I was immediately shot by a less lethal munition of some type, likely a pepper; ¶¶8-9 (While trying to leave walking away with hands up, she was immediately shot by less lethal munitions several times, on the back and the back of her legs. The deputies continued to shoot while she was running away. She was struck nearly a dozen times, all in the back or back of her legs as she ran.); ¶17 (September 7, 2020 protest) (The deputies employed pepper balls, rubber bullets, flashbangs, and tear gas indiscriminately throughout the entire crowd of protesters for several minutes.); ¶19 (As deputies advanced towards protesters they fired munitions and threw flash bang grenades and tear gas at protesters and journalists alike);

- Declaration of Joseph Mischo, ECF 13-4 page 105 (September 5, 2020 protest): ¶10 (Some time between 8pm and 9pm, LASD deputies indiscriminately opened fire with less lethal projectiles on the protestors, and threw flash bangs and stinger grenades. The deputies provided no warning or dispersal order before using force against the protesters. He was hit in the back with two pepper balls, and the side of his car was hit with at least four pepper balls.);

- Declaration of Alexandra Marsella, ECF 34-6, page 23 (September 8, 2020 protest): ¶4 (Deputies shot her with what she believes were hard foam bullets, pepper balls, and flash bang grenades. The shot her legs, hips, shins, elbows, left shoulder, right forearm, and left cheek); ¶5 (She was trying to leave the area, make sure other protesters were leaving safely, and trying to stay with a group for safety. The LASD kept advancing

towards them on foot and in trucks and continued to shoot at them. She was on foot with a group of protesters heading North up Normandie Ave. Trying to get away from the LASD deputies who continued to shoot at them, they turned East onto 110th Street between Normandie and Budlong.);

• Declaration of Roxanne McQueen ECF 34-6, pp. 27-28 (September 8, 2020 protest): ¶5 (She was trying to leave the area, heading north on Normandie with a group of protesters, but LASD deputies were chasing them, running on foot and driving armored trucks, shooting at them.

## II. PLAINTIFFS HAVE SHOWN AN LASD CUSTOM OR PRACTICE OF USING EXCESSIVE FORCE AGAINST NON-VIOLENT PROTESTERS.

The beginning point is that Plaintiffs Ms. Astorga and Mr. Padilla's incidents were not isolated incidents involving a few deputies whose actions received only low level supervisory review; rather, their incidents arose out of events involving hundreds of protesters with many dozens being subjected to less-lethal rounds. Consequently, the deputies' on-scene conduct received extensive and specialized supervisorial review up to and including then Sheriff Villanueva:

• "Since late May 2020, there have been large nationwide public protests regarding multiple officer-involved shootings, law enforcement practices, and the desire by some members of the public for systemic changes and reform. The scope and number of such protests have been unprecedented in recent history." Declaration of LASD Commander Lewis (ECF 299-3 filed 10/1/22 @ 26:20-24); "[F]rom approximately August 25 through today [9/28/20], there have been almost daily LASD responses to protests . . ." (*Id.*, at 26:13-15).

• One of the units under Commander Lewis' command was the Sheriff's Response Team, or "SRT." "The SRT was developed to quickly respond to natural disasters, acts of terrorism, and pre-planned events that are potentially threatening and disruptive to public safety." ECF 299-3 @ 24:10-20, 28:19-22. When deployed

for the 9/8/20 protest,[1] all SRT personnel were under the oversight of the weekly duty, tactical commander, and [were] in [Cmmd'r Lewis'] direct chain of command and supervision." ECF 299-3 @ 29:5-8.

- At the 9/8/20 protest, "SRT personnel engaged the [allegedly] violent protesters on five separate occasions . . ." LASD Lt. Charles L. McDaniel ¶7(K) (*Berg v. County of Los Angeles*, 2:20-cv-7870 DMG, ECF 23-1 filed 9/28/20 @ 32:11-12).

- At the 9/8/20 protest, on-scene "*sergeants* were directing the deputies to fire the rounds." 2/3/22 Chapman depo. 44:15-18 (emphasis added) (**Exhibit Q** hereto);

- "The [deputies'] actions prior, during and after the use of force on September 8, 2020, at South Los Angeles Station were in compliance with Department policy, procedures and training and properly documented." Lt. Jones' 9/25/20 correspondence to Capt. Francisco, ECF 317 filed 10/18/22 @ page 3.

- "All SRT members acted within [sheriff's] department policy." 2/3/22 Chapman depo. 70:4-9 (ECF 299-2 filed 10/1/22 @ page 241)[2];

---

[1] The 9/8/20 South Los Angeles protests was among the protests for which the SRT was deployed. ECF 281-1 filed 9/9/22 @ 7-11.

[2] Notwithstanding defendants' objections, Chapman's opinion that the deputies were following department policy is admissible. Even if not considered an admission, Chapman's deposition is the functional equivalent of a declaration and thus can be offered on summary judgment as if he were *Plaintiffs*' expert. *Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 967 (9th Cir. 1981), and *Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1056 (9th Cir. 2001).

Moreover, since defendants have not withdrawn Chapman as their expert his cited deposition testimony also qualifies as an admission by defendants' authorized agent. *See* Orders filed 7/14/13 (ECF 325) and 7/15/13 (ECF 330) in *Bravo v. City of Santa Maria*, 2:06cv6851 FMO (Judge Olguin rules the plaintiffs may read to the jury defense expert Meyer's deposition testimony even though defense did not call him as a witness.). *Glendale Fed. Bank, FSB v. U.S.*, 39 Fed. Cl. 422, 425 (1997) is not to the contrary.

- At his September 10, 2020 press conference, then Sheriff Villanueva justified the SRT's less-lethal rounds fired at the September 8 protesters, claiming the protesters had "started throwing objects, dangerous things at our deputies," including, according to Villanueva, "mortar rounds, fireworks, glass bottles, water bottles."[3] Furthermore, because Ms. Astorga and Mr. Padilla were among those arrested, Villanueva claimed – *falsely* – that they had these items in their possession when they were arrested. 9/10/20 press conference (https://youtu.be/xzlM0ry6yuA) at 12 minute 40 to 45 second mark (referring to the "mortar rounds, fireworks, glass bottles, water bottles," Villanueva states "every single one [who] was arrested, had this type of thing."). *See* ECF 299-2 @ page 20 (Astorga booking and property record) and page 21 (Padilla booking and property record).[4]

From Villanueva's press conference statements a jury could reasonable conclude the following: (1) Villanueva was actively involved in the supervisorial review of the 9/8/20 protest; (2) he knew of and approved the SRT deputies firing lethal-lethal rounds at protesters;(3) his accusation that the 9/8/20 protesters had assaulted deputies was false

---

There, the court did not allow the reading *at trial* of the other side's expert's deposition testimony because that party had withdrawn the expert. Here, Plaintiffs are using Chapman's testimony on *summary judgment*. Furthermore, Chapman is still defendants' expert, *i.e.*, defendants have not withdrawn him.

[3] 9/10/20 Villanueva press conference at the one minute and 20-25 second mark, and 12 minute and 8-14 second mark (https://youtu.be/xzlM0ry6yuA). Both sides have previously cited and relied on Villanueva's 9/10/20 press conference. Supp. Declaration of Donald W. Cook filed 11/20/20 @ ¶5 (ECF 21-1 @ 3:20-23); Defendant County of Los Angeles' Supplemental Opposition filed 11/27/20 @ 2:5-13 (ECF 26).

[4] For Ms. Astorga, the only items she had when arrested was "Clothing worn" (see "Property" box) while for Mr. Padilla, the report's "Property" box is blank.

(as shown by even the LASD videos not to mention Plaintiffs' declarations[5]); and (4) Villanueva falsely claimed that when arrested Ms. Astorga and Mr. Padilla had on them items of the type used for assaulting deputies.

Consequently, a jury could reasonably conclude that the deputies shooting Ms. Astorga and Mr. Padilla with the less-lethal rounds was pursuant to a County and LASD practice and/or custom, a practice and/or custom specifically approved by Villanueva. This conclusion can establish *Monell* liability (as well as Villanueva's personal liability given his active involvement in the supervisory review followed by his obvious ratification and false statements). In *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), the Ninth Circuit held that given his status as a policymaker, then LAPD Chief Gates' post-incident conduct subjected the city to liability under *Monell*:

> Where the principal allegations in this case include among them that Gates set a tone which condoned and encouraged the use of excessive force, we can hardly think of better evidence than statements [made by Gates] consistent with those claims. [Citations omitted.] To the extent the opinions of Chief Gates shed light on the operation, custom, or policy of his department, or on his ratification or condonation of the injurious acts, his statements, if admitted upon retrial, may, of course, be used as evidence on the issue of his liability and that of the City.
>
> \* \* \* \*
>
> [T]here was evidence of a departmental policy or custom of resorting to the use of excessive force. The jury properly could find such policy or custom from the failure of Gates to take any remedial steps after the violations. *McRorie*, 795 F.2d at 784 (custom inferred from failure to reprimand or discharge); *Grandstaff*, 767 F.2d at 171 ("subsequent acceptance of

---

[5] For the LASD videos, see ECF 297 & "Plaintiffs' Notice of Lodging of CD re Exhibits A-1, A-2, B and C"; *see also* ECF 299-2 filed 10/1/22 @ 2:6-18.

> dangerous recklessness by policymaker tends to prove his preexisting disposition *and policy*") (emphasis added). Gates's statements, coming from a final policymaker on police matters, also properly could have been considered to represent the LAPD's policy or custom of condonation of, and acquiescence in, the use of excessive force by its officers.

946 F.2d at 645, 647.

### III. The Relevance of *Velazquez* and *Berg*.

In *Velazquez v. City of Long Beach*, 793 F.3d 1010 (9th Cir. 2015), the *Monell* evidence arose from a single officer (Abuhadwan) who had multiple incidents of possible excessive force. While *Velazquez* did not lay down a rule on how many incidents are necessary to show *Monell* liability, from the number of incidents ("30 internal affairs incidents of force since 2007, 19 of them using a baton or flashlight") the court found a jury could "reasonably [] infer from [the] prior complaints that the Long Beach Police Department was aware that Abuhadwan had previously used excessive force when making arrests, but had taken no steps to curb his propensity." 793 F.3d at 1028.

A similar analysis and conclusion applies here. On September 8, on five separate occasions multiple deputies fired less lethal rounds. And when they fired the rounds, the deputies did so *at the direction of their sergeants*. Thereafter, numerous supervisors of higher rank up to and including Sheriff Villanueva reviewed these uses of force, finding that all deputies acted properly despite even LASD videos showing there were no assaults on deputies. Just as the 30 complaints in *Velazquez* showed knowledge and implicit department acquiesce in the officer's misconduct, the multiple incidents here involving many different deputies for whom there was no evidence any were assaulted, support a finding that the entity defendants condone firing less lethal rounds at non-threatening protesters. *See also Henry v. County of Shasta*, 132 F.3d 512, 518-20 (9th Cir. 1997) (Three separate incidents at different times but involving nearly the same identical conduct though with different deputies, was sufficient for evidence of a county custom or practice under *Monell*.).

*Berg v. County of Los Angeles* pending before Judge Gee, also supports a finding that a jury here could conclude that the less lethal rounds used against Ms. Astorga and Mr. Padilla were pursuant to the entity defendants' policies or customs. Because the *Berg* plaintiffs were seeking injunctive relief barring deputies from firing less lethal rounds against non-violent protesters, Judge Gee had to find sufficient evidence of a County policy, custom or practice that encouraged or condoned such use of force. *Los Angeles County v. Humphries*, 562 U.S. 29, 37-39 (2010). Relying on, *inter alia*, the 9/8/20 South LA protests (including the LASD and Beckner-Carmichael videos) Judge Gee found sufficient evidence of a County and LASD policy, practice or custom that justified injunctive relief. *Berg*, 2021 WL 4691154 at *12 (C.D. Cal. 2021). While Judge Gee's conclusion is obviously not binding on this Court (there is no final judgment in *Berg*) it is nevertheless highly persuasive. After all, Judg Gee had before her much of the same evidence this Court has, evidence that is centered on deputies using less lethal rounds against non-violent protesters.

And the record in *Berg* – including the protests on August 25, September 5 and 7, 2020, is before this Court. In opposition to summary judgment, Plaintiffs relied on Judge Gee's May 2021 ruling granting an injunction that limited defendants' use of less lethal rounds against non-violent protesters. Besides the evidence cited in Judge Gee's May 2021 order, Plaintiffs also submitted evidence originally filed in *Berg*. Beckner-Carmichael video (ECF 299-2 filed 10/1/22 @ 2:25-3:4); LASD Commander Lewis' declaration (ECF 299-2 @ 5:22-26).

DATED: April 6, 2023

                        **COLLEEN FLYNN**
                      **PEDRAM ESFANDIARY**
                       **MONIQUE ALARCON**
                        **DONALD W. COOK**
                        Attorneys for Plaintiffs

By _____
                Donald W. Cook

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   CHRISTINA ASTORGA, an individual, on         )
     behalf of herself and as class              )
 5   representative; HUGO PADILLA, an            )
     individual, on behalf of himself and class  )
 6   representative; RYAN MICHAEL                )
     DODSON, an individual, and KIYOKO           )
 7   DODSON, an individual, on behalf of         )
     themselves and as class representatives,    )
 8                                               )   Certified Copy
                          Plaintiffs,            )
 9                                               )   Case No.
         vs.                                     )   2:20-cv-9805
10                                               )   AB (AGRx)
     COUNTY OF LOS ANGELES, a                    )
11   municipal corporation; LOS ANGELES          )
     COUNTY SHERIFF'S DEPARTMENT, a              )
12   public entity; SHERIFF ALEX                 )
     VILLANUEVA, an individual; and Does 1       )
13   through 10, all sued in their individual    )
     capacities,                                 )
14                                               )
                          Defendants.            )
15                                               )

16

17

18           REMOTE DEPOSITION OF CLARENCE CHAPMAN

19                  Thursday, February 3, 2022

20

21

22

23

24   Reported by:
     Marie T. Mellgren
25   CSR No. 9442
```

                                                              1

INSTANT COURT REPORTING, INC.    (888) 831-9490

```
 1        A.    Not to my knowledge, sir.
 2        Q.    Is -- by the way, who were the sergeants who
 3   were in charge of the SRT team?
 4        A.    It was Coppes, C-O-P-P-E-S, and he was out of
 5   West Hollywood.  And then there was Mueller, and I
 6   believe that's M-U-E-L-L-E-R, and I think he was the
 7   sergeant that was over the operation at South Bureau,
 8   which is Normandy and 110, 111, that kind of thing.
 9        Q.    Do you want to give me their employee numbers,
10   too?  Just kidding.
11              Pretty good, Chief.
12        A.    For an old man, I've got a pretty good
13   memory.
14        Q.    Yeah, no, pretty good, pretty good.
15              Did any of the sergeants actually themselves
16   fire less lethal rounds?
17        A.    No.  Sergeants were directing the deputies to
18   fire the rounds.
19        Q.    In an instance where a deputy fires a less
20   lethal round and he knows it strikes a person who's
21   later taken into custody, is the deputy who fired the
22   round, is he or she supposed to make a report, whether
23   it's an oral report or a written report that, you know,
24   I fired one or more less lethal rounds and it hit
25   somebody who was later taken into custody?
```

```
 1                    REPORTER'S CERTIFICATE
 2
 3           I, the undersigned, a Certified Shorthand
 4   Reporter of the State of California, do hereby certify:
 5           That the foregoing proceedings were taken
 6   before me at the time and place herein set forth; that
 7   Clarence Chapman, in the foregoing proceedings, prior
 8   to testifying, was duly sworn; that a record of the
 9   proceedings was made by me using machine shorthand,
10   which was thereafter transcribed under my direction;
11   that the foregoing transcript is a true record of the
12   testimony given.
13           Further, the foregoing pertains to the
14   original transcript of a deposition in a federal
15   case, and before completion of the proceedings,
16   a review of the transcript was requested.
17           I further certify I am neither financially
18   interested in the action nor a relative or employee of
19   any attorney or party to this action.
20           IN WITNESS WHEREOF, I have this date
21   subscribed my name.
22   Dated:   February 23, 2022.
23
24                   _____
                              Marie T. Mellgren
25                            CSR No. 9442
```

177