UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:20-cv-09805-AB-AGR | Date: | May 28, 2024 |
|---|---|---|---|

Title: *Christina Astorga et. al. v. County of Los Angeles et. al.*

Present: The Honorable **ANDRÉ BIROTTE JR., United States District Judge**

| Daniel Tamayo | N/A |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Appearing | None Appearing |

**Proceedings:** **[In Chambers] ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR RECONSIDERATION (DKT. 280); ORDER GRANTING IN PART, DENYING IN PART MOTION FOR SUMMARY JUDGEMENT (DKT. 281); ORDER OVERULLING PLAINTIFFS' MOTION TO STRIKE EVIDENCE DEFENDANTS FILED IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGEMENT (DKT. 296)**

Before the Court is the Motion for Summary Judgement Or, Alternatively, Partial Summary Judgement ("Motion", Dkt. 281) filed by Defendants County of Los Angeles, Los Angeles County Sheriff's Department (together, the "Entity Defendants"), and Sheriff Alex Villanueva[1] (all together, "Defendants"). Plaintiffs Christina Astorga, Hugo Padilla, Ryan Dodson, and Kiyoko Dodson opposed ("Opposition", Dkt. 299), to which Defendants replied ("Reply", Dkt. 313). The

[1] On February 9, 2022, the Court dismissed Plaintiffs' official capacity claims against Sheriff Villanueva with prejudice. *See* Dkt. 205.

Court heard oral argument on December 16, 2022, and ordered supplemental briefing which beget further briefing on a variety of topics thru late 2023. *See e.g.* Dkt. 324, Dkt. 348. The parties accompanied their filings with extensive statements of facts and voluminous evidence, along with certain evidentiary objections[2]. For the reasons articulated below, the Court hereby **GRANTS** in part, and **DENIES** in part Defendants' Motion for Summary Judgement.

## I. Background

Given the extensive litigation in this case, the Court has previously summarized the factual background in numerous prior orders. *See*, *e.g*., Order Denying Plaintiffs' Second Amended Motion for Class Certification (Dkt. 179); Order Denying in Part and Granting in Part Defendants' Motion for Judgement on the Pleadings (Dkt. 205); Order Denying Plaintiffs' Motion for Partial Judgement (Dkt. 211). For purposes of this Motion, the Court offers the following brief summary of the claims.

Arising from their participation in two protests during the summer of 2020, in which the nation grappled with the murder of George Floyd in Minneapolis and other police-involved deaths of individuals across the country, including Breonna Taylor (Louisville), Andres Guardado (Los Angeles), and Dijon Kizzee (Los Angeles), the Plaintiffs sued local law enforcement for a variety of alleged civil rights and constitutional violations. In their Second Amended Complaint ("SAC"), Plaintiffs lodge seven claims: injunctive relief for the "ongoing seizure of personal property" (Claim One); a 42 U.S.C. §1983 claim for violations of the Fourth and Fourteenth Amendment related to the seizure of certain property (Claim Two); a 42 U.S.C. § 1983 claim for a violation of the Fifth Amendment also related to the seizure of certain property (Claim Three); a 42 U.S.C. §1983 claim for a violation of the Fourth Amendment related to their arrests (Claim Four); a 42 U.S.C. §1983 claim for the violation of the First Amendment (Claim Five); a California constitutional claim (Claim Six); and injunctive relief under California's Bane Act (Claim Seven). *See* Dkt. 105. The California constitutional claim, Claim Six, was

---

[2] Plaintiffs filed a Motion to Strike Evidence Defendants Filed in Support of Their Motion for Summary Judgement. *See* Dkt. 296. To the extent that this Order relies on any objected-to-evidence, **those objections are overruled.** Any other objections articulated in Plaintiffs' Motion to Strike **are overruled as moot**. *See Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1118-1122 (E.D. Cal. 2006) (concluding that "the court will [only] proceed with any necessary rulings on defendants' evidentiary objections.")

dismissed with prejudice on February 9, 2022. Dkt. 205. During oral argument on December 16, 2022, Plaintiffs conceded Claim One for injunctive relief as moot, but have since re-raised the issue in their Supplemental Brief. *See* Dkt. 354.

Defendants move for summary judgement as to all remaining claims.

## II. Legal Standard

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

A genuine dispute occurs "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252, (1986).

On a motion for summary judgment, courts view the facts in the light most favorable to the non-moving party. *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989). Furthermore, a court "does not make credibility determinations or

weigh conflicting evidence" on a motion for summary judgment. *Demuth v. Cty. of Los Angeles*, 2011 WL 13134311, at *2 (C.D. Cal. Sept. 21, 2011) (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987)). "[A] federal court has discretion to consider materials in the record not cited by the parties, but it is not required to do so." *Huber v. Coulter*, 2015 WL 13173223, at *3 (C.D. Cal. Feb. 10, 2015), *aff'd*, 684 F. App'x 623 (9th Cir. 2017) (citing Fed. R. Civ. P. 56(c)(3) and *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001)).

## III. Undisputed Facts

The Court finds that the following material facts are undisputed. Although the same or similar facts were stated by different sides, for ease of reference the Court cites directly the factual statements filed in the Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("DSUF", Dkt. 281-4) in connection with the Defendants' Motion. The Court will reference Plaintiffs' Statement, which includes Plaintiffs' Additional Disputed Material Facts ("PSUF", Dkt. 299-1), only to the extent necessary. Finally, some of the parties' purported undisputed facts are not facts at all but are legal conclusions. The Court will not treat these as "facts" but instead will address the relevant legal disputes in the discussion.

*The September 8, 2020, Protest in South Los Angeles*

On September 8, 2020, Plaintiffs Christina Astorga and Hugo Padilla attended a protest, called "Justice for Dijon Kizzee," at the intersection of Imperial Highway and Normandie Avenue ("September 8 Protest"). DSUF, Fact No. 1. During the September 8 Protest, Sergeant Muller from LASD declared the protest an unlawful assembly at approximately 8:10 p.m., and over a loud PA speaker, instructed the protesters to immediately disperse and continued to give numerous orders thereafter. *See* DSUF, Fact No. 8. During the September 8 Protest, the Los Angeles County Sheriff's Department ("LASD") made seventeen arrests and seized property of some arrestees. DSUF, Fact No. 12. Among the seized properties were several cell phones. DSUF, Fact No. 13.

To this statement of facts, Plaintiffs add that "LASD deputies were shooting indiscriminately…" *see* PSUF at 88, Fact No. 213, that "LASD deputies shot [her] left buttocks with less-lethal munitions as she was retreating towards the back of the apartment building with her back to the deputies", *see* PSUF at 89, Fact No. 224, and that "LASD deputies also shot [her] left knee with less-lethal

munitions…" *see* PSUF at 89, Fact No. 225.

The September 8 Protest arrests were made pursuant to violation of California Penal Code Section 409 – Failure to Disperse at the Scene of a Riot. DSUF, Fact No. 17. Despite the District Attorney declining to pursue the Penal Code Section 409 charges, LASD retained seized property as part of another ongoing investigation. DSUF, Fact No. 18. Two weeks after the September 8 Protest, files regarding the September 8 Protest incident were submitted to LASD's Major Crimes Bureau ("MCB") for investigation by Detective Short. DSUF, Fact No. 19.

At some time in late September or early October 2020, MCB contacted Detective Short to advise him to put a hold on releasing any personal property of the seventeen arrestees. DSUF, Fact No. 21. As of January 6, 2021, many items had been returned. DSUF, Fact No. 23. The parties dispute the legitimacy of the retention of other items. The Defense claims "[the property was] held for evidentiary purposes in an ongoing criminal investigation" and that "[c]ell phones booked into evidence related to the September 8 Protest were still held as part of an ongoing investigation, along with category of items such as military grade goggles, bicycle helmets, gas masks, cameras, video cameras and accessories, and industrial leaf blowers." *Id*. Plaintiffs, on the other hand, claim the investigation was pretextual, and that there was no legitimate reason to retain the property.

*Christina Astorga*

When Astorga arrived at the intersection of Imperial Highway and Normandie Avenue in South Los Angeles on September 8, 2020, she saw deputies lined up covering the width of Normandie, a helicopter above the area, and a group of protestors. DSUF, Fact No. 24. When protestors started running, Astorga began running in the same direction of the crowd, going north on Normandie. DSUF, Fact No. 26. Astorga contends that "[she] did not hear any announcements by law enforcement to disperse or about an unlawful assembly." PSUF at 88, Fact No. 217. Astorga was arrested for violation of California Penal Code Section 409 – Failure to Disperse at the Scene of a Riot. Astorga was then placed into a van to be transported to the Los Angeles County Sheriff's Department's South Los Angeles station for booking. DSUF, Fact No. 28.

The parties dispute the way the arrest was effectuated, or, at the very least, diverge in their chosen language and points of emphasis. Defendants state that "[Astorga] had no complaints about the manner she was placed in the van." DSUF

¶ 29. On the other hand, Astorga states that "[b]efore placing [her] in the van, a male deputy shoved [her] against an LASD transport vehicle, a pick- up truck, pressing her neck/throat against the railing of the vehicle, causing her pain…[t]he male deputy twisted [her] index and middle finger on her right hand, causing pain and aggravating the preexisting injury to her right arm and hand". PSUF at 16, Fact No. 29. Defendants also state "[n]o LASD personnel made threats against her on September 8 or 9, 2020." PSUF at 11, Fact No. 33. Astorga further adds to the narrative that "[a]fter [she] was arrested and driven to LASD south LA station, deputies took photos of her and other arrestees with deputies' personal cell phones…[and] that a deputy went into her phone and changed the profile description for her Wall of Vets Instagram from Black Lives Matter to Blue Lives Matter…" PSUF at 18-19, Fact No. 33.

*Hugo Padilla*

Plaintiff Hugo Padilla was arrested at the September 8, 2020, Protest in South Los Angeles for violation of California Penal Code Section 409 – Failure to Disperse at the Scene of a Riot. DSUF, Fact No. 39. Padilla heard the unlawful assembly and dispersal instructions clearly. DSUF, Fact No. 40. Approximately 20 minutes after the 8:10 dispersal order, Padilla was going towards where the helicopter lights were to record the incident. DSUF, Fact No. 48. Padilla then fell off his bike and was subsequently arrested. DSUF, Fact No. 50. He was restrained with metal handcuffs soon after he fell on the ground. *Id*. Padilla was placed into a truck after his arrest and was transferred to the South Los Angeles Station on Imperial Highway. DSUF, Fact No. 52. Padilla had his iPhone, his keys, and his backpack on him when he went into the truck. DSUF, Fact No. 53. LASD personnel tended to Padilla's handcuffs and loosened them per his request before he entered the station. DSUF, Fact No. 54.

To this statement of facts, Padilla adds that LASD deputies shot [with a less lethal projectile] him in his left knee. *See* PSUF at 100, Fact No. 311. Padilla was shot off his bicycle just before the end of his video. PSUF at 101, Fact No. 312. One of the deputies who jumped on him punched him in the mouth, causing his lip to bleed, swell and split. PSUF at 101, Fact No. 315. The property Padilla had on his person after he was arrested were his iPhone X cell phone, wallet, and keys and he was still wearing his backpack. PSUF at 349, Fact No. 349.

//
//

*September 25, 2020, Protest in West Hollywood*

On September 25, 2020, Plaintiffs Ryan Michael Dodson and Kiyoko Dodson attended a protest in West Hollywood, California to protest police violence, including the death of Breonna Taylor by Louisville officers. ("September 25 Protest") DSUF, Fact No. 59. During the September 25 Protest two trucks, a black Ford F350 truck and a white Chevrolet Silverado truck ("Dodson Truck"), were leading marching protestors. DSUF, Fact No. 60. During the September 25 Protest, at approximately 9:05 p.m., after hours of protest and when the protestors and their vehicles created grid lock, an unlawful assembly was declared, and dispersal orders were given. DSUF, Fact No. 62. During the September 25 Protest, the Los Angeles County Sheriff's Department made seven arrests and seized property of arrestees. DSUF, Fact No. 72.

*Ryan Dodson & Kiyoko Dodson*

Ryan Dodson was driving the Dodson Truck during the September 25 Protest and led a group of people who were walking behind the vehicle during this protest. DSUF, Fact No. 74-75. Mr. Dodson was stopped by LASD personnel and arrested during on Sunset Boulevard. DSUF, Fact No. 83. He was cited for violation of California Penal Code § 407 (failure to disperse) and California Vehicle Code § 23103(a) (reckless driving) and was released from custody on September 26, 2020. DSUF, Fact No. 90-91. His allegation for use of force in this lawsuit is that officers pushed him against his truck during his arrest. DSUF, Fact No. 94.

Kiyoko Dodson, Mr. Dodson's wife, was on foot, walking and marching with other demonstrators at the September 25 Protest. DSUF, Fact No. 96. Mrs. Dodson was not arrested at this incident. DSUF, Fact No. 97. She, nor her husband, were shot by anything during this incident. DSUF, Fact No. 98.

*Search Warrants*

On September 9, 2020, an LASD Detective prepared a search warrant ("Sept. 8 Warrant") for cellphones and other devices containing electronic information from the September 8, 2020, protest arrests as part of a criminal investigation related to conspiracy to incite a riot and conspiracy to assault law enforcement officers. DSUF, Fact No. 127. The Sept. 8 Warrant, signed by Superior Court Judge Margaret Bernal, included standard language: "proof by affidavit having been made before me … that there is probable cause to believe

that the property described herein may be… 'property or thing as used as the means of committing a felony', 'property or things in possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing it or preventing them from being discovered', and 'property or things to be seized consisting of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony'. DSUF, Fact No. 128. The 9/8/20 Warrant Affidavit indicated that Plaintiffs Astorga and Padilla were suspects of having committed crimes on September 8, 2020. DSUF, Fact No. 130.

Detective Gentner commenced an investigation on September 26, 2020, with respect to Ryan Dodson's possible criminal acts. DSUF, Fact No. 134. Detective Gentner sought a search warrant for the Dodson Truck and a 2017 Ford truck on October 13, 2020 ("Dodson Truck Warrant"). DSUF, Fact No. 135. Like the Sept. 8 Warrant, the Dodson Truck Warrant also included the above referenced standard language. In preparing the Dodson Truck Warrant, Detective Gentner relied on the observations he personally made at the September 25 protest, various police reports, and videos from news reports. DSUF, Fact No. 143. The reasonableness of the time it took to obtain the Dodson Truck Warrant is a central aspect of the Fourth Amendment claims.

Additionally, LASD obtained a sealed search warrant for cellphones and other devices containing electronic information from the September 25, 2020, arrests pursuant to the criminal investigation for conspiracy to incite a riot and conspiracy to assault law enforcement officers. DSUF, Fact No. 173. This warrant included the Dodsons' property located inside their truck ("Dodson Property Warrant"), such as cell phones, memory sticks, and electronic media. *Id*; *see also* DSUF 177. The Dodson Property Warrant was presented to the Court on October 13, 2020. DSUF, Fact No. 174. The Dodson Property and Truck Warrants were submitted to the Court on the same date at around the same time. DSUF, Fact No. 175. The Dodson Property Warrant was approved by Magistrate Judge Deborah Sanchez on October 13, 2020. DSUF, Fact No. 176.

*Other Facts*

In their DSUF, Defendants also included a section related to "LASD Policies re: Plaintiffs' § 1983 Claims against the Entity Defendants". *See* DSUMF 178 – 199. Rather than recite that entire section which includes mostly opinion or

argument rather than fact, the Court finds it more efficient to refer directly to the written polices, *see e.g.,* Exhibit FF, as necessary.

## IV. Discussion

Against all defendants, Plaintiffs seek injunctive relief and compensatory damages for LASD's retention of certain property without a warrant or judicial review, namely Astorga, Padilla, and Kiyoko Dodson's personal items and Ryan Dodson's truck (Claim One and Claim Two). Against the LASD and the County, Plaintiffs seek compensation for the "de facto forfeiture of Plaintiffs' property" in violation of the Takings Clause of the Fifth Amendment, believing that their property was taken as punishment for their presence at the protests (Claim Three). Against all defendants, Plaintiffs Astorga, Padilla, and Dodson seek punitive damages for the allegations of excessive force and arrest in absence of probable case (Claim Four). Plaintiffs also seek punitive damages for deprivation of First Amendment rights (Claim Five). The claims rest on a *Monell* theory of liability with Plaintiffs alleging that these violations were products of a policy or custom, and these policies and customs were ratified by the LASD, the County, Sheriff Villanueva, and other actors from law enforcement.

### A. *Monell* Liability

Municipalities and local government units may be liable under 42 U.S.C. § 1983 if the action violating a constitutional right was carried out pursuant to an official policy or a long-standing custom. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978). To confer liability upon a municipality plaintiffs must prove (1) that the plaintiff possessed a constitutional right of which they were deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

Policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations and "in rare instances," single constitutional violations that are so inconsistent with constitutional rights that even a single instance indicates at least deliberate indifference of the municipality. *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1152 (9th Cir. 2021). As for ratification, a municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions and to show ratification, "an official with final policy-making authority

delegated that authority to, or ratified the decision of, a subordinate." *Segura v. City of La Mesa*, 647 F. Supp. 3d 926 (S.D. Cal. 2022) (internal citations omitted). "The policymaker must have knowledge of the constitutional violation and actually approve of it…[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).

For our present purposes, we focus most on whether there are disputes of material facts as to whether a constitutional violation existed, and if so, whether there are disputes of material facts as to whether there was a policy or custom in place.

### B. Injunctive Relief and Reasonableness of Delay (Claim One and Two)

Claims One and Two are related because each concern the return of property. The Court will address Claim Two first, before returning to the newly resurrected Claim One.

Against all Defendants, Claim Two concerns the retention of Plaintiffs' various property items "without a warrant or judicial review" in violation of the Fourth and Fourteenth Amendment. Plaintiffs allege that the LASD was unjustifiably delayed in securing a warrant for properties seized from the protests and unjustifiably delayed in returning the items. *See e.g.*, SAC ¶ 68, 70. Plaintiffs further believe that "the pretextual reason LASD decided upon to refuse to return persons' property, was that the property would be held as potential evidence for a purported ongoing criminal investigation for alleged conspiracy to incite a riot and conspiracy to assault law enforcement officers. *See e.g.*, SAC ¶ 69.

It is undisputed that search warrants were eventually obtained. *See* DSUF Fact Nos. 128, 140, 176. For property seized from the September 8 Protest, a warrant was prepared on September 9, 2020. At least some items from this protest were not returned until the following year, such as Padilla's cell phone, which was not returned until June 9, 2021, and Astorga's cell phone, which was not returned until July 9, 2021 as well as Astorga's goggles that were not returned until September 22, 2021. *See* DSUMF Fact Nos. 116-119. For the property seized from the September 25 Protest, a warrant was not sought until October 13, 2020. Plaintiff Dodson's truck was not released from City Terrace Tow until November 10, 2020, and certain other personal property and that of Mrs. Kiyoko Dodson was not released until December 3, 2020. SAC ¶ 60-61. Finding no issue with the next-day warrant secured for the September 8 Protest, the issues at hand are whether the

seizure of the Plaintiffs' property was unreasonable given the delay in securing the Dodson Truck Warrant and the delay in returning the seized property.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To be sure, the Ninth Circuit has also analyzed property seizures under the Due Process clause of the Fourteenth Amendment, sometimes in conjunction with a Fourth Amendment analysis. *See e.g., Lavan v. City of Los Angeles,* 693 F.3d 1022, 1029–32 (9th Cir.2012). Furthermore, whereas other circuits have concluded that property continually retained but initially seized pursuant to valid search warrants may only be violative of the Fourteenth Amendment rather than the Fourth Amendment, the Ninth Circuit has recognized that such a circumstance may implicate both amendments. Indeed, "here, in the Ninth Circuit, the Fourth Amendment protects Plaintiffs' interests in possessing property that has been validly seized." *Sandoval v. Cnty. of Sonoma*, 72 F. Supp. 3d 997, 1003 (N.D. Cal. 2014), aff'd, 912 F.3d 509 (9th Cir. 2018), and aff'd, 912 F.3d 509 (9th Cir. 2018). That the Ninth Circuit recognizes a plaintiff's possessory interest in property even validly seized is supported by other circuits that have acknowledged that, absent justification, the government had no right to hold onto property that is not contraband indefinitely. *Lindell v. United States*, 82 F.4th 614, 621 (8th Cir. 2023)(citing Third Circuit precedent).

Additionally, the time between the seizure of property and securing a warrant matters as unreasonable delay may also violate an individual's Fourth Amendment rights. *See United States v. Sullivan*, 797 F.3d 623, 633 (9th Cir. 2015). "The touchstone is reasonableness." *Id*. The Ninth Circuit has affirmed that we are to look to the totality of circumstances, including the individual's possessory interests, not whether the Government pursued the least intrusive course of action to determine reasonableness. *Id*. Sister circuits, like the Second Circuit have articulated the deciding factors as being: "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized items, and [4] the strength of the state's justification for the delay." *United States v. Smith*, 967 F.3d 198 (2d Cir. 2020) (recognizing that delays as short as eleven days could possibly support a constitutional violation). To be sure, whether an individual has a reduced property interest includes consideration of whether that person is incarcerated or otherwise under supervision of the government. *See e.g*., *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) (considering defendant's parolee status in analyzing unreasonable delay). If there was an unreasonable delay, then we may move to the next step of whether there was a policy or custom that supported it.

This Court previously denied summary adjudication on this claim when moved for by the Plaintiff. *See* Dkt. 211 The Court does the same here. As to the delay in seeking a warrant, the Court concludes that in absence of a bright-line rule as to the number of allowable days, and because an eighteen-day delay may still support a constitutional violation, the question of reasonableness ought to go before a factfinder. Indeed, a jury ought to decide whether LASD Detective Gentner's focus on another investigation or the impact of the increased protest-related activities on LASD's workload, among other factors, are sufficient to bring the delay within the realm of reasonableness. The Court also notes that the Plaintiffs' possessory property interest was not reduced by incarceration, or any other formal incapacitation. Moreover, in weighing the circumstances, the specific property at issue warrants special consideration. Indeed, LASD did not simply hold on to a few items of relatively little consequence like, say, a jacket. They retained someone's vehicle, a deeply personal item of property that plays an everyday role in the average car owner's life. Hindering the access to one's car can have serious consequences on someone's work commute or ability to take care of their family. A jury of peers ought to hear and weigh the evidence to determine the reasonableness of this delay.

The Court reaches the same conclusion with respect for the length of delay in returning Astorga's, Padilla's, and Kiyoko Dodson's property, particularly their cell phones that were held by law enforcement for nearly nine months. Just as the Court noted the special consideration that ought to be made for the retention of one's truck, the same is true for the modern person's cell phone, and the Supreme Court agrees. In *Riley*, the Supreme Court noted that cell phones are different from other property in both "the quantitative and qualitative sense", even joking that because cell phones "are now such a pervasive and insistent party of daily life…[even] the proverbial visitor from Mars might conclude they were an important feature of human anatomy". *See Riley v. California*, 573 U.S. 373, 385 (2014). A jury of peers should hear the evidence, and based upon what is currently before the Court, a reasonable jury could conclude that the length of the retention of these particular items constituted an unreasonable seizure and a violation of due process.

Whether there was a policy or custom that supported this delay is a more difficult question but viewing the evidence in the light most favorable to the Plaintiff, the answer also disfavors summary judgement. Defendants offer a variety of LASD's written policies outlining protocol and underlying values with respect to seizure and retention of property allegedly related to investigation. *See e.g.*

Exhibit FF & Declaration of Lieutenant Jose Aguirre, Jr. No policy presented to the Court appears to articulate a specific timeframe for when LASD officers ought to seek warrants other than "[i]t is LASD policy for search warrants to be sought in a timely and reasonable manner, and without any unnecessary delay…" *See* DSUF Fact No. 197. Likewise, no policy presented to the Court appears to articulate a specific timeline for release other than "generally, property not held originally as evidence or no longer needed as evidence is to be released to the legal owner." *See* DSUF Fact No. 194. These policies do not dictate whether, and how often, the LASD is to keep owners abreast as to the status of the retention, nor do the policies appear to dictate the protocol for obtaining a warrant if personnel are stretched thin. These policies are imprecise, but they are indeed policies nonetheless, and whatever consequences that arise from the imprecision falls on the shoulders of the Defendants. Thus, the only other inquiry is whether the LASD's action comported with the policy, and Defendants have affirmed numerous times throughout this litigation that their actions followed policy. *See e.g.* DSUF Fact No. 178; *see also* Exhibit P (Chapman Expert Report ("Chapman's Expert Report"), Opinion #11)(Defense expert Clarence Chapman's statements and expert noting that LASD's confiscation of personal items were "consistent with normal booking and incarceration rules.")

If the actions taken, or lack thereof, by the LASD with respect to obtaining a warrant and releasing the property are the very actions at issue, and those actions are consistent with LASD policy, then the jury, rather than the Court, ought to assess the department's ultimate liability as to what Plaintiffs believe was a constitutional violation. In other words, there's a genuine dispute as to the material facts surrounding the circumstances of the delays, and there appears to be a policy endorsing the delays which could confer *Monell* liability, so the factfinder ought to resolve the issue after hearing and weighing the evidence. For these reasons, the summary judgement is **DENIED as to Claim Two.**[3]

Regarding injunctive relief, while the Plaintiffs initially conceded their claim, Plaintiffs indicated in their Supplemental Brief (Dkt. 354) that their claim for injunctive relief is not actually moot. Plaintiffs claim they recently learned that the Defendants still had in its possession certain data that was extracted and copied

[3] Plaintiff filed a Motion for Reconsideration of the court's previous summary adjudication (Dkt. 280), urging the Court to rule as a matter of law that the delay in obtaining the warrant was unreasonable in violation of the Fourth Amendment. With the analysis and ultimate finding for Claim Two, this Court **DENIES** Plaintiff's motion as we conclude that there are triable issues.

from Astorga and Padilla's phones. Dkt. 354 at 4; Exhibit B. In failing to return these copies, Plaintiffs contend that their injunctive relief claim is still alive because Defendants have not returned all of their property, i.e., their data. While the parties have not presented Ninth Circuit caselaw exactly on point, at least some other circuits across the country have recognized that the "government's continued retention of [] phone[s] and *all its data* raises constitutional issues distinct from the lawfulness of the search warrant or its execution." *Lindell v. United States*, 82 F.4th 614, 621 (8th Cir. 2023) (emphasis added). Indeed, that same appellate court noted that "the retention of data unrelated to the government's investigation and which goes beyond the terms of the search warrant implicates an individual's right to be free from unreasonable searches and seizures." *Id*.

In their Supplement Briefing (Dkt. 357), Defendants challenge Plaintiffs' contention not on the grounds that they do not still possess the data, but that the Plaintiffs never sought the return of data that was lawfully extracted from their smart phones. This challenge fails. First, Plaintiffs could not seek what they did not know existed, and based upon their representations, Plaintiffs were not aware of, nor the extent of, the data extraction. Second, the issue is whether the data is lawfully retained, not lawfully extracted. Given that the criminal investigation concluded long ago, the continued retention of the data may constitute a constitutional violation. And, as assessed in the preceding section, the Court finds that there is a policy or custom animating this conduct. Therefore, Plaintiffs Astorga and Padilla have alleged an ongoing seizure of their personal property sufficient to go before a jury and thus, summary judgement with respect to **Claim One is DENIED.**

### C. Takings (Claim Three)

Plaintiffs argue that "[b]y seizing Plaintiffs' items of personal property and not returning them despite Plaintiffs' repeated requests, the Entity defendants physically took possession of Plaintiffs' property ostensibly for a public purpose of punishing Plaintiffs for their mere presence at the September 8 and 25, 2020 protests." SAC ¶ 89. And by this possession, "the seizures without any judicial review constituted a 'taking' within the meaning of the Takings Clause of the Fifth Amendment to the United States Constitution." *Id.*

In support, Plaintiffs rely heavily on *Cedar Point Nursery v. Hassid*, 594 U. S.___, 141 S.Ct. 2063, 2076 (2021), in which the Supreme Court stated that "the government can commit a physical taking either by appropriating property through a condemnation proceeding or by simply entering into physical possession of

property without authority of a court order." (citations omitted). Not only was a warrant issued for the seizure of the Plaintiffs' property, *Cedar* dealt with the impact of a local regulation on farmers rather than property held temporarily following an arrest, and while the Court does not necessarily need all cited cases to be exactly on point, Plaintiff did not offer any caselaw discussing property seized in the course of criminal investigations and arrest as implicating the Fifth Amendment. From the Court's own research, the caselaw is inconclusive at best, and disfavors Plaintiffs' position at worst. In *Bennis v. Michigan*, 516 U.S. 442 (1996), the Supreme Court recognized that "the government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain." *Id.* at 452. Here, Defendants took possession of the property on their authority as law enforcement, not eminent domain. On the other hand, at least one circuit has recognized that "the reasonableness of holding onto seized property is not dependent on the government's belief it has an ongoing evidentiary need or the statute of limitations for the offense under investigation, as that might in many cases impose an impermissible burden on a citizen whose property is potential evidence and be tantamount to a forfeiture without the procedures required by statute and by due process." *Lindell v. United States*, 82 F.4th 614, 621 (8th Cir. 2023). However, not only does Supreme Court precedent prevail over any Eighth Circuit findings, the present case is not a forfeiture case in which the Plaintiffs plead innocent ownership.

Considering the foregoing and noting other deficiencies including issues of ripeness with respect to whether law enforcement could be said to have reached a final decision as required by Takings doctrine, Defendants' motion for summary judgement for **Claim Three is GRANTED.**

### D. Excessive Force and Probable Cause (Claim Four)

*Excessive Force*

Against all Defendants, Claim Four concerns the alleged excessive force used during the arrest of Astorga, Padilla, and Mr. Dodson. Excessive force claims are analyzed under an objective reasonableness standard. *See Sanchez v. Cnty. of San Diego*, 464 F.3d 916, 928 (9th Cir. 2006) ("The California Supreme Court has made clear ... that [t]he touchstone for all issues under the Fourth Amendment ... is reasonableness.")(internal citations omitted). "Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when

feasible." *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (discussing the reasonableness of use of a beanbag projectile "akin to a rubber bullet"). In assessing the use of force, the Court considers: "(1) "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted," (2) "the government's interest in the use of force," and (3) the balance between "the gravity of the intrusion on the individual" and "the government's need for that intrusion." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017). Certain factors may include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight…" *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

As to the September 8 Protest involving Astorga and Padilla, there's little dispute that force was used, which included "pepperballs", "blastballs", "stingball grenades", and the like. However, based upon the factual record, the Court finds that there are genuine disputes of material fact as to the circumstances surrounding the execution of the force. For example, in addition to the video footage of the protests, Plaintiffs submitted photo evidence showing injuries significant enough to raise an inference that the force was disproportionate. Furthermore, as to justification, there are disputes as to whether some of the Plaintiffs heard orders to disperse and whether they disobeyed these orders. Finally, while law enforcement certainly has a governmental interest in crowd control, that interest must be closely watched and weighed against the constitutional allowances for protest and assembly. Based upon the disputed circumstances, a jury may find that the force deprived the Plaintiffs Astorga and Padilla of their Fourth Amendment protections.

The use of force against Mr. Dodson concerns the allegation that officers slammed him against the truck during his arrest, and Mr. Dodson argues that a jury could find that the use of force was disproportionate in light of the *Graham* factors, i.e., that the arrest was for a minor offense, that there was no attempt to evade arrest, and that there was no threat to officers. The Court agrees and concludes that a jury may view the video footage and determine that excessive force was used.

However, as to whether there was a policy or custom in place and whether that policy or custom was sufficiently connected to the alleged constitutional violation, the Court reaches different conclusions for the different days of protest. As to the September 8 Protest, Defendants appear to challenge the existence of a policy that was a moving force behind the constitutional violations, and contend that where force was used, such force was constitutionally sound. Plaintiffs, on the other hand, appear to allege that there is an unofficial policy or custom in place

regarding the arguably indiscriminate, or at least, imprecise, deployment of less lethal force during protests, *see e.g.* SAC ¶ 50, that the use of force was retaliatory, *id*, and that this policy was further ratified by department officials. As a starting point, Exhibit EE, which is the internal correspondence authored by Sergeant Ryan Bergner, is useful here. Throughout this letter to the Sheriff's Response Team regarding the September 8 Protest, Sergeant Berger describes the "derogatory comments" and "verbal attacks" lodged by the protest crowd and writes numerous times that the Sheriff's Response Team "responded with appropriate and directed force towards the hostile crowd." Exhibit EE– 496-498. Sergeant Berger further contends that "all SRT members acted within department policy and displayed discipline when physically engaging with the crowd." Exhibit EE – 500. Sergeant Berger then goes on to list the specific number of pepperballs, stingballs, etc. deployed which included Deputy Duke Sanders launching as many as 200 pepperballs. Sergeant Berger writes that it was difficult to target individuals and that they were "unable to contact any individuals in the crowd that were directly impacted…" Exhibit EE – 500.

Additionally, Plaintiff argues that Defendant Villanueva discussed the deployment of less lethal force and relies on certain televised statements made by him during a local broadcast from June 3, 2020, ahead of the September protests.

Taken together, LASD's internal correspondence and external communications support an inference of a policy regarding the indiscriminate use of less lethal projectiles during protests, including the September 8 Protest. Indeed, the Court disagrees with Defendants' contention that these statements, in lacking specificity to the Plaintiffs' specific claims, are of no consequence. Defendants, on their own volition, chose to draft certain internal correspondence and chose to make certain sweeping statements that went beyond neutral observations of the days' events and instead made a point to comment on, and blanketly justify, their use of force. Judge Gee of this Court reached a similar conclusion when assessing the *Monell* liability of these very same defendants for actions taken during the same 2020 summer protests. *See Berg v. Cnty. of Los Angeles*, 2021 WL 4691154 (C.D.Cal., 2021). Judge Gee, citing Ninth Circuit precedent, recognized the importance of not "attri[buting] other protestors' actions to those plaintiffs who [did not physically] provoke the police" and noted that "…in response to some protesters throwing items at deputies, LASD indiscriminately shot less-lethal projectiles and used chemical weapons against peaceful protesters, legal observers, and journalists alike who had not participated in physical provocation." *Id.* at 11. (citing *Felarca v. Birgeneau*, 891 F.3d 809, 818 (9th Cir. 2018)). As to whether there was an unofficial policy, Judge Gee noted that no officers were reprimanded

for the various occasions throughout the summer of 2020 where LASD used excessive force on peaceful protestors and that Villanueva's comments on television news that he "expected deputies to defend themselves…with less lethal force," supported an inference of the existence of an informal practice or custom. *Id*. at 13.

Here, too, viewing the record in the light most favorable to the Plaintiff, the record presents serious questions as to whether the LASD had an unofficial policy of indiscriminately using less-lethal projectiles on crowds of protestors. For these reasons, summary judgement as to **Plaintiff Astorga and Plaintiff Padilla's Claim Four (excessive force) is DENIED**.

The September 25 Protest is different, though. There is less support on the record that any policy was the moving force behind how Plaintiff Ryan Dodson's arrest was effectuated. Moreover, counsel seems to hitch this allegation of excessive force to a finding that the police lacked probable cause. Unlike the September 8 allegations wherein the policy or custom at issue could be said to be the imprecise or indiscriminate deployment of certain injurious projectiles into protest crowds, here, Plaintiff does not articulate the "slamming" policy or custom (or subsequent ratification) with respect to a particular individual's arrest. For these reasons, summary judgement as to **Plaintiff Ryan Dodson's Claim Four (excessive force) is GRANTED.**

*Probable Cause During Arrest*

Claim Four also concerns a lack of probable cause for the arrest of Plaintiffs Astorga. Padilla, and Ryan Dodson. "To determine whether the [police officers] had probable cause at the time of the arrest, we consider whether at that moment the facts and circumstances within [police officers] knowledge ... were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Edgerly v. City & Cnty. of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010). "Mere suspicion, common rumor, or even strong reason to suspect are not enough." *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir.2007). "…[P]robable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City & Cnty. of San Francisco*, F.3d at 953 (9th Cir. 2010).

Here, Plaintiff Astorga and Padilla contend that probable cause was lacking because no unlawful assembly should have been declared in the first place. *See*

Opposition at 12. In support of this argument, Plaintiffs point to a variety of exhibits that they say shows that "protestors were milling around, with some holding signs and some speaking over bullhorns…" and that there "deputies are seen standing around, not reacting to any form of violence, because none takes place." Opposition at 11 (referencing Exhibit II, Exhibit A-1, and others). Plaintiffs further challenge probable cause on the ground that Defendants have not produced evidence that either Astorga or Padilla actually refused to disperse, and rely on evidence of maps, photos, and booking records. As for Mr. Dodson, he contends that various officers who submitted declarations supporting the arrests had not personally observed Dodson's conduct and so, the officers' statements are hearsay. While there may be genuine disputes of fact as to the exact circumstances surrounding the arrests, Plaintiffs' ratification theory on this claim is unavailing and Plaintiffs do not point to any evidence supporting nor articulating a policy that operated as the moving force behind the arrests. For this reason, Plaintiffs' Fourth Amendment claim for lack of probable cause fails. Thus, summary judgement as to **Plaintiffs' Claim Four (probable cause) is GRANTED.**

### E. First Amendment (Claim Five)

Against all Defendants, Plaintiffs allege that the general conduct of law enforcement "violat[ed] Plaintiffs' rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution." SAC ¶ 96. Specifically, Plaintiffs contend that Defendants' September 8 dispersal order was unlawful because they were not acting violent, nor did they pose a clear and present danger of imminent violence, *see* Opposition at 10-11, and, as to both demonstrations, that "because defendants took action against plaintiffs because of their participation in these demonstrations, they violated the plaintiffs' First Amendment rights", Opposition at 28-29. The argument overlaps significantly with Plaintiffs' arguments regarding lack of probable cause, in that Plaintiffs rely on certain video evidence and contend that protestors were just "milling around". Opposition at 11. Furthermore, Plaintiffs argue that not only were the dispersal orders unlawful, the Defendants also took such action against the Plaintiffs because of their voicing of their political view and their view about unlawful police brutality.

However, in this Court's view, the central issue with this claim is not whether the protesters were executed their rights under the First Amendment. Rather, the flaw here is the Plaintiffs' failure to identify, and support with evidence, the LASD policy or custom that acted as the moving force behind the alleged First Amendment violation. Whereas Claims One, Two and Four can

reasonably be viewed to involve a policy related to property retention and indiscriminate less lethal shooting, here Plaintiffs do not articulate nor support with evidence a policy related to, say, mass arrests during large gatherings. Even if the Court were to consider Sheriff Villanueva's comments regarding the protests, much of the commentary concerned less lethal force generally, rather than, say, dispersal orders. For these reasons, the Court does not believe that there is any dispute of material fact regarding Claim Five that would warrant proceeding with this claim before a jury. Therefore, summary judgement as to Plaintiffs' **Claim Five (First Amendment) is GRANTED**.

### F. Bane Act (Claim Seven)

Because at least one other federal claim survives, the Court will exercise its discretion to retain jurisdiction over this state law claim. For this claim, Plaintiffs allege that they are entitled to damages under California Civil Code § 52.1 (the "Bane Act") "for wrongful seizure of themselves and their personal property…" SAC ¶ 102.

To confer liability under the Bane Act, Plaintiffs are not required to show that the interference with their rights were accomplished by threats, intimidation, or coercion that is independent from the constitutionally violation alleged, but they are required to show a "specific intent to violate the arrestee's right to freedom from unreasonable seizure." *See Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City and County of San Francisco*, 17. Cal.App.5th 766, 799-800 (2017)("Our reading of Section 52.1 is consistent with the view taken by 'the majority of federal district courts in California[, which] have held in Bane Act cases that where Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.")(internal citations omitted)). To be sure, to find liability under the Bane Act, the Plaintiffs must plead and prove the unconstitutional act. *See Cornell v. City and County of San Francisco*, 17. Cal.App.5th 766, 797 (2017).

California courts of appeal have held that there are two requirements for a finding of specific intent: "[f]irst, the court must make the legal determination of whether the right at issue [is] clearly delineated and plainly applicable under the circumstances of the case" and "second, if the first condition is answered in the affirmative, the jury must make the second, factual, determination." *Murchison v. Cnty. of Tehama*, 69 Cal. App. 5th 867, 284 Cal. Rptr. 3d 742 (2021). The question

is: "[d]id the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that ... right?" *Id.* If both requirements are met, even if the defendant did not recognize the unlawfulness of his has, he will be adjudged as a matter of law to have acted with the requisite specific intent, "i.e., in reckless disregard of constitutional or statutory prohibitions or guarantees" *Id.*

Notably, as written in their SAC, *see* ¶ 102, Plaintiffs base their Bane Act claim on the wrongful seizure of themselves (which the Court presumes relates to their allegations regarding lack of probable cause) and property, and not their claims related to excessive force or the First Amendment. On the other hand, their argument in the Opposition appears to focus on the LASD's use of force as violative of the Bane Act. *See* Opposition at 30-31. Sticking to what's in the SAC, the Court's analysis will focus on whether there is sufficient evidence to support a Bane Claim based on the allegations related to property and the lack of probable cause at the time of their arrests.

As to probable cause, the right at issue is to be free from arrest without probable cause. Viewing the evidence in the light most favorable to the Plaintiffs, the protected right is clearly delineated and plainly applicable, and there is sufficient evidence on the record to support a constitutional claim. Indeed, there are serious questions regarding whether some plaintiffs heard the dispersal orders, whether the dispersal orders were warranted at all, and few facts on the record suggest that the Plaintiffs themselves (rather than some protestors in the mass crowd) were in engaged in any activity other than peaceful protesting. The second question is a question of fact whether the Defendants acted with the particular purpose of depriving Plaintiffs of their right to be free from arrest without probable cause. *Cornell v. City and County of San Francisco,* 17. Cal.App.5th at 803-804 (2017) ("[s]ubjective 'spite' was relevant here, along with all of the objective circumstances surrounding the unlawful arrest, both before it and after it… [b]ut whether the appellant officers understood they were acting unlawfully was not a requirement…[r]eckless disregard of the 'right at issue' is all that was necessary"). Viewing the evidence in the light most favorable to the Plaintiffs, the record could support a jury's conclusion that Defendants acted with the specific intent to deprive Plaintiffs of their rights by recklessly disregarding those rights when they arrested these individuals after relatively little investigation. Therefore, Plaintiffs Bane Act claim survives summary judgement as it relates to the wrongful seizure of their person.

Regarding property, the Court already made a finding that the record

supports a constitutional violation as it relates to Plaintiff Dodson's property. The question now becomes whether there is sufficient evidence to demonstrate the specific intent to violate Mr. Dodson's rights. Viewing the evidence in the light most favorable to the Plaintiffs, a jury could find that the Defendants acted with reckless disregard to Plaintiff's constitutional rights sufficient to infer specific intent. In reaching this conclusion, the Court considered the already discussed facts surrounding the delay in securing the Sept. 25 Warrant and the delay in returning the property. Therefore, Plaintiffs' Bane Act claim survives summary judgement as it relates to wrongful seizure of Plaintiff Dodson's property, and thus, Defendants' motion for summary judgement on **Claim Seven (Bane Act) in DENIED**.

### G. Sheriff Villanueva's Qualified Immunity

Defendant Villanueva argues that he is entitled to qualified immunity because he neither violated Plaintiffs' constitutional rights nor did he violate any clearly established law. Defendant Villanueva hinges much of this argument on the contention that he was not personally involved in any of the events of September 8 and September 25. In §1983 actions such as the present case, "qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". *Sampson v. Cnty. of Los Angeles by & through Los Angeles Cnty. Dep't of Child. & Fam. Servs*., 974 F.3d 1012, 1018 (9th Cir. 2020) (internal citations omitted). "Qualified immunity is only an immunity from a suit for money damages and does not provide immunity from a suit seeking declaratory or injunctive relief." *See Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012). Therefore, any qualified immunity challenge to Claim One is irrelevant. *Id*. at 942. ("[C]laims for injunctive and declaratory relief are unaffected by qualified immunity").

In deciding whether qualified immunity is available, the Ninth Circuit follows a two-part test, asking 1) whether the plaintiff has plausibly alleged a violation of a constitutional right and 2) whether the constitutional right was clearly established at the time of the conduct at issue. *Id.* Under the second question, a "clearly established" right exists where "every reasonable official would have understood that what he is doing violates that right at the time of his conduct." *Id.* Clearly established law cannot be at a high level of generality and must be particularized to the case. *See Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). While a case directly on point is not necessary to defeat qualified immunity, existing case law must have put "every reasonable official" on notice that the conduct was unconstitutional and must be controlling

law from the Ninth Circuit, the Supreme Court, or from a consensus of courts outside the relevant jurisdiction. *Martinez v. High*, 91 F.4th 1022, 1031 (9th Cir. 2024) (internal citations omitted); *see also Jensen v. City of Oxnard,* 145 F.3d 1078, 1085 (9th Cir.1998) ("[t]o show that the right in question here was clearly established, [the plaintiff] need not establish that [the officers'] behavior had been previously declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law.") To be sure, reaching the conclusion that an official violated a plaintiff's constitutional rights does not necessarily resolve the question as to whether every reasonable official would have known that their conduct ran afoul of the constitution. Indeed, it is possible for an official to have, say, used excessive force without knowing that they were obviously violating a plaintiff's rights.

Defendants correctly note that there is no *respondeat superior* liability under § 1983. *See e.g., Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citing *Monell*). However, Plaintiffs do not quite articulate Sheriff Villanueva's liability as one of *respondeat superior* wherein his liability is only implicated simply because he is the supervisor of bad actors beneath him the employment hierarchy. Instead, Plaintiffs argue something more – that Plaintiff Villanueva was personally involved in "creating an environment wherein his deputies believe they act and in fact they do act with impunity". *See* Opposition at 28. Ninth Circuit law does allow a police chief to be held liable in his individual capacity if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *see also Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022) (noting that supervisors can be held liable for "1) their own culpable action or inaction in the training, supervision, or control of subordinates; 2) their acquiescence in the constitutional deprivation of which a complaint is made; or 3) for conduct that showed a reckless or callous indifference to the rights of others.) But while senior law enforcement can be held liable for their role in a subordinate's violative conduct, Plaintiffs must still make a showing that, at the time of the violation, the law gave fair warning that the conduct was unconstitutional such that every reasonable official would have known.

Here, the SAC put at issue numerous actions by law enforcement, including the indiscriminate shooting of less lethal projectiles at a large crowd, the dispersal orders, and the retention of property seized following the arrests. In previous sections of this Order, the Court already concluded that the indiscriminate shooting and the retention of property plausibly implicate the Fourth Amendment and the

Fourteenth Amendment. Thus, prong one is satisfied for those actions.

When assessing the dispersal orders for *Monell* liability, we granted summary judgement in favor of the Defendants because the Plaintiffs did not meet their burden in showing a policy motivating law enforcement's actions. However, liability under *Monell* is irrelevant to the qualified immunity analysis, *see Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1250 (9th Cir. 2016), so we must assess the dispersal orders through a different lens. Plaintiffs contend that their First Amendment rights were violated when law enforcement declared the demonstrations unlawful, and protesters were instructed to disperse. Whereas LASD claims that protestors threw items at officers such as fireworks, smoke bombs, and frozen water bottles, Plaintiffs dispute these claims with video footage of portions of the protests showing demonstrators holding signs and "milling around". The Defendants have not made any allegation that the Plaintiffs themselves hurled any items at the officers. Furthermore, Plaintiffs Astorga and Padilla argue that even if the dispersal orders were warranted, they had already left the area where the unlawful assembly was declared and were arrested a half mile away. Clearly, there are factual disputes as to the circumstances surrounding the nature of the protests and the dispersal orders. If the Court were to draw all reasonable inferences in favor of the Plaintiffs, as it should, it is plausible that Plaintiff's First Amendment rights were infringed if they themselves peacefully participated in the demonstrations and dispersed as told.

The analysis of prong two is much more difficult. Plaintiffs cite, with little description, a handful of cases that they contend clearly establish that LASD's conduct on September 8 and 25, and the actions that followed, were unlawful. *See* Opposition at 28. But the Court cannot accept this general contention without careful consideration of how the conduct in the cases cited by the Plaintiffs could have fairly warned law enforcement in our case about their conduct. Indeed, while the constitutional claims implicated in the cases cited may be the same as the present case, the conduct in some of the cases is entirely different than the conduct at issue in the present case.

As to the indiscriminate shooting of projectiles at a large crowd, Plaintiffs offer *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) and this case is sufficient to support a conclusion that the law was clearly established. *Nelson* involved excessive force allegations against university campus police who shot pepperball projectiles to disperse a large crowd of students. The Ninth Circuit concluded that "a reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening

individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the Fourth Amendment." *Id*. at 886. The Ninth Circuit reached this conclusion "even when [the] force was applied in the larger context of crowd dispersal." *Id*. at 887. The Ninth Circuit was persuaded in part by a Tenth Circuit case involving officers who used pepperball guns against demonstrators protesting the Iraq war and noted that the plaintiff had not heard the dispersal order and even acknowledged the plaintiff was never charged with a crime. *Id*. (discussing *Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008)). The conduct and reasoning in *Nelson* are sufficient support for the conclusion that the law prohibiting law enforcement's conduct was clearly established.

But the similarities between the remaining conduct and the other cases offered by the Plaintiff are not as apparent as with *Nelson*. *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996), for example, analyzed qualified immunity in the context of dispersal orders given to a large crowd. However, the specific conduct at issue on appeal was the city's choice to preemptively ban all demonstrations throughout the city. *Id*. 1370 ("…we have jurisdiction to consider...whether [the defendant] could reasonably have believed on May 1, 1992, that, on the basis of the events that undisputedly had transpired on April 30, it was lawful to prevent all demonstrations, peaceful or otherwise, throughout the City of San Francisco"). As the Court noted earlier, the exact nature of the protest is disputed but the present case in no way involves a mass ban prior the demonstrations. Even if, *arguendo*, the Court were to draw favorable inferences to the Plaintiffs that they themselves were lawfully protesting, the Court cannot conclude that it was clearly established *beyond debate* that executing general dispersal orders against a large crowd, even if the order may not have fairly applied to every individual in that crowd, violates the First Amendment. In other words, standing in the figurative shoes of law enforcement *at the time* of the conduct, rather than hindsight, it cannot be said that every reasonable officer would have been on notice that issuing a mass order to a protesting crowd, especially after hours of demonstrating, violates the constitution. Therefore, without an underlying clearly established constitutional violation, we need not assess Sheriff Villanueva's supervisory role and conclude that he is entitled to qualified immunity for Claim Five (First Amendment).

Likewise, Plaintiffs offered no cases that involve law enforcement's choice to retain property and a supervising sheriff's liability in his individual capacity. Indeed, even if the retention was unreasonable, that does not necessarily mean that every officer would have known that the conduct ran afoul of law, especially if those officers eventually obtained warrants. Therefore, Sheriff Villanueva is

entitled to qualified immunity for the property seizure allegations related to Claim Two.

Because the Court concludes that Plaintiffs have plausibly alleged that the indiscriminate shooting of projectiles at a protest crowd violated the constitution and that the law was clearly established, what remains for the Court to decide at present is whether Plaintiffs have offered sufficient support for the contention that Sheriff Villanueva set in motion a series of acts by others or knowingly refused to terminate a series of acts by others which he knew or reasonably should have known would cause others to inflict the constitutional injury, or failed to act in training, supervising, or controlling his subordinates. The Court concludes that the Plaintiffs have met their burden. As discussed throughout this Order, it is undisputed, or, at the very least, reasonably inferred, that Sheriff Villanueva was aware that LASD's approach to large protest crowds included their use of projectiles, even when it was difficult to target specific individuals, that this approach was used on September 8 and September 25, and that no subordinates were disciplined following the protests. Sheriff Villanueva should have known that empowering his subordinates to, or failing to train or control to the contrary, that dispersing a crowd in the way they did could inflict constitutional injury. For these reasons, Sheriff Villanueva is not entitled to qualified immunity for the excessive force allegations in Claim Four.

## V. Conclusion

For the foregoing reasons, the Court hereby **DENIES** Plaintiffs' Renewed Motion for Reconsideration (Dkt. 280), **GRANTS** in part and **DENIES** in part the Motion for Summary Judgement (Dkt. 281) and **DENIES** the Motion to Strike any evidence that was relied on (Dkt. 296).

**IT IS SO ORDERED**.